## HELVERING, COMMISSIONER OF INTERNAL REVENUE, v. CEMENT INVESTORS, INC.*

No. 644. Argued April 27, 1942.—Decided June 1, 1942.

*Together with No. 645, *Helvering, Commissioner of Internal Revenue,* v. *James Q. Newton Trust,* and No. 646, *Helvering, Commissioner of Internal Revenue,* v. *Newton,* also on writs of certiorari, 315 U. S. 825, to the Circuit Court of Appeals for the Tenth Circuit.

*Assistant Attorney General Clark,* with whom *Solicitor General Fahy* and *Messrs. Sewall Key, J. Louis Monarch,* and *Samuel H. Levy* were on the briefs, for petitioner.

*Mr. Stephen H. Hart,* with whom *Mr. James B. Grant* was on the brief, for respondent in No. 644.   *Mr. Richard M. Davis* for respondents in Nos. 645 and 646.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

The issue presented by these cases is whether, under § 112(b)(5) of the Revenue Act of 1936 (49 Stat. 1648,

1678, 26 U. S. C. § 112 (b) (5)), the gain of the taxpayers from the transactions in question should be recognized.

The taxpayers owned first mortgage bonds of Colorado Industrial Co., which was a wholly-owned subsidiary of the Colorado Fuel and Iron Co. The bonds were guaranteed both as to principal and interest by the parent company. After defaults on these bonds, and on other bonds issued by the parent company, each company filed a petition under § 77B of the Bankruptcy Act. A plan of reorganization was formulated by committees of the security holders. It provided for the formation of a new company, to which all the assets of the two debtor companies would be transferred. The new company would assume the obligations of the bonds of the old parent company, Colorado Fuel and Iron Co., and issue income bonds and common stock in exchange for the bonds of the old subsidiary company, Colorado Industrial Co. The stockholders of the debtor companies would receive no interest in the new company; but in exchange for their stock they would receive warrants for the purchase of shares of the new company. Approval of the plan by the requisite percentage of security holders was obtained. The plan was confirmed by the court in April, 1936, and was duly consummated as follows: The debtor companies, the bankruptcy trustee, and the trustee under the indenture securing the bonds of the old subsidiary company, conveyed the assets of the debtors to the new company. The new securities were issuable to, or on the order of, the reorganization managers, who were acting, as stated in the plan, as "agents" of the security holders. The reorganization managers effected an exchange of the old securities for the new on or about September 1, 1936. Immediately after the consummation of the plan, all of the issued shares of the new company (552,660 shares of common, out of an authorized issue of 1,000,000 shares) belonged to the former holders of the bonds of the old subsidiary company. No stock was issued

by the new company to other parties until October, 1936, when 37 shares were issued on exercise of the warrants. By June, 1938, only 465 shares had been issued to holders of the warrants.

Each of the taxpayers in these cases exchanged his Colorado Industrial Co. bonds for income bonds and common stock of the new company  In each case, the fair market value of the new securities exceeded the basis of the old.  The Commissioner determined deficiencies on the ground that the profit from the exchange was a taxable gain.  The Board of Tax Appeals held for the taxpayers. See 42 B. T. A. 473.  The Circuit Court of Appeals affirmed (122 F. 2d 380, 416), holding, *inter alia,* that the exchange met the requirements of § 112 (b) (5).  We granted the petitions for certiorari because the application of § 112 (b) (5) to receivership or bankruptcy reorganizations raised important problems in the administration of the income tax law.

It is plain from *Helvering* v. *Southwest Consolidated Corp.,* 315 U. S. 194, which involved identical definitions of the term "reorganization" as are involved here, that this transaction does not meet the requirements of § 112 (g) (1) (B) of the 1936 Act.[1]  The assets of the old companies were not acquired in exchange "solely" for voting stock of the new company, since income bonds and warrants were also issued.  It is also clear that the requirements of § 112 (g) (1) (C) were not satisfied, since clause C "contemplates that the old corporation or its stockholders, rather than its creditors, shall be in the dominant position of

_____

[1] In *Helvering* v. *Southwest Consolidated Corp., supra,* no question as to the applicability of § 112 (b) (5) was involved.  The only question raised or considered by the Board or the Circuit Court of Appeals, or passed on by this Court, was whether or not the transaction in question qualified as a "reorganization" under § 112 (g) (1) of the 1934 Act.

'control' immediately after the transfer and not excluded or relegated to a minority position." *Id.*, p. 202. But it does not necessarily follow that § 112 (b) (5) is inapplicable. Sec. 112 (b) (5) provides:

"No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange."

"Control" is defined in § 112 (h) to mean

"the ownership of stock possessing at least 80 per centum of the total combined voting power of all classes of stock entitled to vote and at least 80 per centum of the total number of shares of all other classes of stock of the corporation."

If it may be said that property was transferred by the bondholders to the new corporation, then the other requirements of § 112 (b) (5) were satisfied. For the bondholders, as owners of all of the outstanding shares of the new corporation, were in "control" of it "immediately after the exchange." And it has not been disputed that the stock and income bonds acquired by each bondholder were substantially in proportion to his interest in the assets of the debtor companies prior to the exchange. Petitioner, however, maintains that the only transfer within the meaning of § 112 (b) (5) was effected by the debtor companies, the bankruptcy trustee, and the indenture trustee; and that the exchange of the bonds for the new securities was merely part of the mechanics for consummation of the plan, and not an exchange by which "property" was

transferred to the new corporation. Though we agreed with the latter proposition, it would not necessarily follow that the requirements of § 112 (b) (5) were not met.

In case of reorganizations of insolvent corporations, the creditors have the right to exclude the stockholders entirely from the reorganization plan. When the stockholders are excluded and the creditors of the old company become the stockholders of the new, "it conforms to realities to date their equity ownership" from the time when the processes of the law were invoked "to enforce their rights of full priority." *Helvering* v. *Alabama Asphaltic Limestone Co.*, 315 U. S. 179. Under that approach, the ownership of the equity in these debtor companies effectively passed to these creditors at least when § 77B proceedings were instituted. But however their interest in the property may be described, it clearly was an equitable claim in or to it. It was that equitable interest with which the plan dealt. The transfer of the properties of the debtor companies to the new corporation was made pursuant to that plan. The plan was approved by the requisite percentage of these creditors, as required by § 77B (e) (1) of the Bankruptcy Act. Thus it is fair to say that the property transferred was property in which the creditors had an equitable interest, and that the transfer was made with their authority and on their behalf. Certainly, "property," as used in § 112 (b) (5), includes such an interest in property. And we see no reason to conclude that a beneficial owner of, or equitable claimant to, property is precluded from consummating an exchange which qualifies under § 112 (b) (5) merely because the actual conveyance is made by his trustee or title holder. In situations comparable to this one, the Board of Tax Appeals has held that § 112 (b) (5) is applicable. Leckie *v.* Commissioner, 37 B. T. A. 252; Miller & Paine *v.* Commissioner, 42 B. T. A. 586. Cf. Rockford Brick & Tile Co. *v.* Commissioner, 31 B. T. A. 537. We accept its view.

The legislative history of § 112 (b) (5) supports that conclusion. Sec. 112 (b) (5) and the "reorganization" provisions are rather closely related. See Miller, Hendricks, and Everett, Reorganizations and Other Exchanges in Income Taxation (1931), ch. 6. While the "reorganization" provisions are restricted to inter-corporate transactions, § 112 (b) .(5) is not so confined, since the phrase "one or more persons" includes "individuals, trusts or estates, partnerships and corporations." Treasury Reg. 94, Art. 112 (b) (5)–1. But there is no indication that the "reorganization" provisions were designed as the exclusive method of deferring recognition of gain or loss in all cases of corporate readjustments or reorganizations. The history of § 112 (b) (5) makes clear that it too was designed to function in that field (*American Compress & Warehouse Co.* v. *Bender,* 70 F. 2d 655, 657–658) and to permit deferment of gains or losses where "there has been a mere change in the form of ownership" or where the taxpayer has not "closed out a losing venture." *Portland Oil Co.* v. *Commissioner,* 109 F. 2d 479, 488. Sec. 112 (b) (5) derives from § 202 (c) (3) of the 1921 Act. 42 Stat. 229, 230. Its legislative history shows that it was designed to permit "readjustments" [2] without present recognition of gain or loss by allowing property to be transferred to a controlled corporation by an individual, a partnership, a corporation, or others.[3] See Hearings, Senate Committee on Finance, Proposed Revenue Act of 1921, 67th Cong., 1st Sess., May 9–27, 1921, pp. 536–537, 546, 557–558; Magill, Taxable Income (1936), pp. 123–131.

---

[2] H. Rep. No. 350, 67th Cong., 1st Sess.; S. Rep. No. 275, 67th Cong., 1st Sess., Committee Reports on the Revenue Acts, 1913–1938, Int. Rev. Bull., pp. 175–176, 188–189.

[3] For the result which would otherwise obtain in such situations, see *Insurance & Title Guarantee Co.* v. *Commissioner,* 36 F. 2d 842, and cases cited.

If a transaction meets the requirements of § 112 (b) (5), the basis of the property in the hands of the acquiring corporation is the same as it would be in the hands of the transferor. § 113 (a) (8). See *P. A. Birren & Son, Inc.* v. *Commissioner*, 116 F. 2d 718. A similar result obtains in case of a transaction which qualifies as a "reorganization." See § 113 (a) (7) (B). And the theory underlying the two basis provisions is the same. Miller, Hendricks, and Everett, *op. cit.*, pp. 304, 404; S. Rep. No. 398, 68th Cong., 1st Sess., Committee Reports on the Revenue Acts, 1913–1938, Int. Rev. Bull., pp. 278–279. The close relationship between § 112 (b) (5) and the "reorganization" provisions is further evidenced by the fact that they overlap to a degree. Thus, a transaction which meets the requirements of clause B or clause C of § 112 (g) (1) may also qualify under § 112 (b) (5). In short, the "reorganization" provisions do not furnish the exclusive methods for securing a deferment of gains or losses arising out of transactions popularly known as corporate readjustments or reorganizations. The instant transaction comes fairly within the family of business readjustments for which § 112 (b) (5) was designed. Hence the fact that it cannot meet the statutory standards of a "reorganization" does not necessarily mean that it cannot qualify as an "exchange," any more than the failure to satisfy one clause of the "reorganization" provisions means that none can be satisfied.

But the argument seems to be that, even though there was an "exchange" which met the requirements of § 112(b) (5), there was nevertheless a gain which is taxable. That gain, it is suggested, arose from the acquisition by the taxpayers of their equitable interest in the properties in substitution for their old bonds. And it is argued that, unlike the situation which obtains under the "reorganization" provisions (*Helvering* v. *Alabama Asphaltic Limestone Co., supra*), § 112 (b) (5) covers only the exchange itself

and not the antecedent steps in connection with a plan of reorganization. Thus the contention seems to be that, since a gain arose from a transaction which was separate and distinct from and anterior to the exchange of property for the new securities, it must be recognized under the general rule of § 112 (a). We express no view on that contention. The deficiencies were not assessed on that transaction but only upon the exchange of stock and securities in the new corporation for bonds of the old. We will not consider here for the first time the question whether a tax liability may have been incurred under § 112 (a) by reason of the earlier transaction, a question not fairly within the issues as framed by the Commissioner and hence not decided below. Cf. *Helvering* v. *Wood*, 309 U. S. 344, 349.

*Affirmed.*