## HARTFORD-EMPIRE CO. v. COMMIS-SIONER OF INTERNAL REVENUE.

### No. 200.

Circuit Court of Appeals, Second Circuit.

July 8, 1943.

Edgar J. Goodrich and Walter J. Brobyn, both of Washington, D. C. (Guggenheimer, Untermyer & Goodrich, of Washington, D. C., of counsel), for petitioner.

Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key, Samuel H. Levy, and Joseph M. Jones, Sp. Asst. Attys. Gen., for respondent.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

The Tax Court held that for the years 1932, 1933 and 1934, the taxpayer must use as a "basis" for the depreciation of certain patents which it owned, their cost to other corporations from which the taxpayer had acquired them; the taxpayer insisted that the proper "basis" was its own cost at the time of acquisition. The issues on which the question turns are two: (1) whether the Commissioner was estopped as to the "basis" by certain earlier orders of the Tax Court, which had assessed deficiencies against the taxpayer for the years 1923 to 1928, inclusive; (2) if he was not, whether the transaction under which the taxpayer got the patents was a "non-recognizable exchange," and made the depreciation

"basis" the cost of the patents to their former owners.

The facts are for the most part undisputed. The taxpayer was organized in 1922 and got its property from three existing corporations which for convenience we shall call the Fairmont Company, the Empire Company, and the Howard Company. It issued 55,000 of its 100,000 common shares to shareholders of the Fairmont Company in exchange for the shares of that company, and assumed its liabilities, which it discharged by issuing preferred shares to the creditors. Some of these were also shareholders of the Fairmont Company. It also took over certain patents and patent rights of the Empire Company by issuing to that company directly the remainder of its common shares—45,000; it did not assume the Empire's liabilities, nor did it get all its assets. The Fairmont Company had already been in negotiation with the Howard Company to acquire the patents and patent rights of that company, and this negotiation the taxpayer continued, and the Howard Company assigned the patents to it in exchange for a cash payment and 4497 of its preferred shares. These shares and those issued to the Fairmont creditors together amounted to 8437, all that were ever issued out of an authorized issue of 15,000. The depreciation "basis" for the Empire and Howard patents is all that is before us in this case.

The issue of estoppel arose as follows. The taxpayer had filed three petitions of review with the Tax Court to expunge deficiencies for 1923 to 1928 inclusive, alleging that "the bases for the computation * * * of the depreciation of the unsold * * * domestic rights consists of the March 1, 1913, value * * * plus the subsequent costs of the inventions developed or purchased by the petitioner and its predecessor." The petitions also set out the "Hartford-Fairmont Rights, March 1, 1913, Value," together with certain subsequent "costs" attributable to them; and "Rights" of five other kinds, including those acquired from the Howard and Empire companies, whose cost was described as "Cost by purchase as at 1/1/23." The Commissioner denied these allegations of the petitions, and extended negotiations followed which were concluded by a stipulation filed on July 1, 1931, on which the Tax Court founded its decision of May 20, 1932. 26 B.T.A. 134. In this stipulation the parties agreed upon the value of the Fairmont patents as of March 1, 1913, and upon their

"cost" to that company; as well as upon the "costs" of the Empire and Howard patents at their acquisition by the taxpayer; but nothing was said of the cost of these patents to the Empire and Howard companies. No explanation appears of this omission except that the decision of the Tax Court declared that only two questions were presented: (1) whether the taxpayer was entitled to any allowance at all for the exhaustion of its patents: (2) whether the taxpayer should be allowed to carry over the Fairmont Company's losses in earlier years. The Court decided the first point for the taxpayer and the second for the Commissioner; and in computing the deficiencies under Rule 50 used the cost of the Empire and Howard patents to the taxpayer as the "basis" for their depreciation.

■■ The first question is whether this decision required the Commissioner to use the same "basis" for depreciation for the years now in question. That the Tax Court's former orders were a conclusive bar for the years 1923 to 1928 nobody disputes; but each year's tax is a separate "cause of action" in the sense that that phrase is used for purposes of estoppel, and the estoppel depends upon whether the actual point was decided and was necessary to the decision. It is true that the Tax Court's actual orders assessing the deficiency—the final judgments—could not have been entered as they were unless the "basis" for depreciation of the Empire and Howard patents had been taken at their cost to the taxpayer; but actually the Court could not decide that question at all, for the stipulation did not present to it any other "basis" for depreciation of the patents. If the orders created any estoppel, it was therefore because the Commissioner had conceded the point and judgment had been entered upon his concession. Had the issue—though it was an issue of law—been actually litigated and decided, we may assume arguendo that the Commissioner would have been estopped. Tait v. Western Maryland Railway Co., 289 U.S. 620, 53 S.Ct. 660, 77 L.Ed. 1470. Indeed, we may also assume that, since the petitions alleged and the Commissioner denied that the "cost" to the taxpayer had been in the amounts stated and since the parties had agreed to the amounts, any future dispute about the amount was precluded, if that ever became relevant to a later contest between the parties. Restatement of Judgments, § 68; Comment f, top of p. 304. But the amount of the "cost" to the tax-

payer is not relevant here unless that cost is the proper "basis" for depreciation; and that was not at issue in the earlier proceeding, and was not, and could not be, decided. How far a decision upon a question of law can be an estoppel in a later action upon a different cause of action is a vexed question, but no one has ever suggested that it can extend to matters not actually litigated.

■ We come therefore to the merits. Section 114(a) of the Revenue Act of 1932, 26 U.S.C.A. Int.Rev.Acts, page 519, made the "basis" for depreciation "the adjusted basis provided in section 113(b) for the purpose of determining the gain or loss upon the sale or other disposition of * * * property"; and § 113(b), 26 U.S.C.A. Int. Rev.Acts, page 518, provided that the "adjusted basis" for computing gain or loss was to be determined by § 113(a). Subdivision (8) of § 113(a) declared that, when property had been acquired after December 31, 1920, by the issuance of "stock or securities" in a "transaction described in section 112(b) (5)" the "basis" should be the same "as it would be in the hands of the transferor, increased in the amount of gain * * * recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made." That meant that, in order to find the "basis" for a transfer made after December 31, 1920, one must take the "basis" of the transferor under the law in force at the time of the transfer, and add to it whatever increase that law would "recognize" as taxable to that transferor provided that the transaction was of a kind described in § 112 (b) (5), 26 U.S.C.A. Int.Rev.Acts, page 511. If the law in force at the time of the transfer "recognized" no increase to the transferor in such a transaction, one was to take his "basis": i. e., his cost. If it did "recognize" an increase by taxing him upon it, his "basis" would be his cost plus that increase.

■■ The first question is whether the transaction at bar was one described in § 112(b) (5) of the Act of 1932. The taxpayer before the Tax Court argued that the Howard transaction was independent of the Fairmont and Empire, and in form it may have been, but the Court found that the transfer of the Howard patents was in fact contemplated as part of a single consolidation of property; and that finding is conclusive, for there was substantial evidence to support it. We are not indeed sure whether this point is still pressed, though it was assigned as error. At any rate the more important argument is that, since the taxpayer assumed the liabilities of the Fairmont Company and issued some of its preferred shares to creditors of that company, these must be deemed to have been issued in payment of the debts and that therefore these preferred shares issued to the Fairmont creditors were not issued in exchange for "property" as § 112 (b) (5) required. Fairbanks v. United States, 306 U.S. 436, 59 S.Ct. 607, 83 L.Ed. 855; Bingham v. Commissioner, 2 Cir., 105 F.2d 971; Lammerding v. Helvering, 74 App.D.C. 2, 121 F.2d 80; Yates v. McGowan, 2 Cir., 126 F.2d 624. The stipulation on which the case was tried stated that "the petitioner paid them" (the notes) "by issuing therefor to the noteholders an equal amount in par value of preferred stock"; and so the Board found; moreover, the notes were made payable "in cash or preferred Stock" of the Fairmont Company "or its successor." We should therefore find it difficult to say that the notes were not paid; but we do not think that the transaction was outside §112(b) (5) for that reason. That section required compliance with three conditions only for a tax free exchange: (1) property must be transferred "in exchange for stock or securities"; (2) the transferors must be in control of the corporation immediately after the transfer; and (3) "the stock and securities received by each" must be "substantially in proportion to his interest in the property prior to the exchange." Of these three conditions the only doubtful one is the second. The first was clearly realized in the exchange of the Fairmont shares and the Empire patents for common shares of the taxpayer; so was it realized in the exchange of the Howard patents for preferred shares. The third condition was also realized, because the shares, exchanged for these properties, were in the same proportion as the owners had held the properties themselves. So far as the common shares are concerned the second condition was also realized; it is only as to the preferred shares that the percentage necessary for "control" fails. We assume with the taxpayer that the section means that "such person or persons" who must be in control of the corporation after the transfer are the "one or more persons" who have transferred property "in exchange for stock"; and we assume further that the fact that some of the Fairmont creditors were also Fairmont shareholders who

transferred property—Fairmont shares—for common shares in the taxpayer does not qualify them to be counted among the preferred shareholders. Although it is literally true these Fairmont shareholders were persons who had transferred property in exchange for the taxpayer's common shares, the statute presumably intended to demand a transfer of property for shares in each class of stock. But we do not think the fact that the notes were paid instead of being transferred should be determinative. That they were property cannot be doubted, and if the taxpayer had accepted an assignment of them and held them against the Fairmont Company, the statute would clearly have been satisfied. That it might indeed have done, for the company was kept alive for several months. Nor did it matter that the Fairmont Company was solvent, unlike the corporation at bar in Helvering v. Cement Investors, 316 U.S. 527, 62 S.Ct. 1125, 86 L.Ed. 1649; for we need not base our decision on the theory that the creditors had an "interest" in the Fairmont assets, though perhaps they did. What we do hold is that so slight a difference as existed here was not enough under a statute such as this which does not "recognize" gains and losses even when owners in severalty pool their properties and own them jointly, or when creditors become preferred shareholders, or preferred shareholders, common shareholders. Certainly a statute which is content to swallow such vital differences in the legal relation to property, should not strain at the difference between paying a debt and taking an assignment of it. What we have said of § 112(b) (5) of the Act of 1932 applies equally to § 202(c) (3) of the Act of 1921, 42 Stat. 230.

Orders affirmed.