## BARKER v. UNITED STATES,
### No. 12826.

United States Court of Appeals
Ninth Circuit.

Nov. 25, 1952.

Rehearing Denied Jan. 9, 1953.

Irell & Manella, Lawrence. E. Irell and Arthur Manella, Los Angeles, Cal., for appellant.

Charles S. Lyon, Asst. Atty. Gen., Tax Division, Ellis N. Slack, Lee. A. Jackson, Edward J. P. Zimmerman, Sp. Asst. Attys. Gen., Walter S. Binns, U. S. Atty., E. H. Mitchell, and Edward R. McHale, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before STEPHENS and HEALY, Circuit Judges, and McCORMICK, District Judge.

STEPHENS, Circuit Judge.

Lawrence Barker, the appellant, is one of two brothers who, with members of their families, were interested in the business of dealing in furniture and household furnishings in Southern California for many years. The business prospered, was incorporated, and the several individual interests have been the subject of many changes. The business is presently a large going concern.

On October 19, 1923, and up to and including December 28, 1923, Barker Bros., Inc., was a California corporation, hereinafter referred to as "Barker California". As of the last date mentioned, its outstanding capital stock consisted of 5750 shares of voting preferred stock and 17,894.35 shares of common stock. The common stock was owned as follows:

| Share Owner | Number of Shares |
| --- | --- |
| Charles Lawrence Barker, as Executor of the Estate of W. A. Barker, Deceased | 3418.19 |
| Pauline Barker | 1660. |
| Lawrence Barker, individually | 1841.50 |
| F. K. Colby, Trustee | 300. |
| Lawrence Barker, Trustee | 960. |
| The above stock will hereinafter be referred to as the "Lawrence Barker Interests" | 8179.69 |
| C. H. Barker, C. A. Barker, and Erle P. Barker | 8187.69 |
| J. W. Beam: Individually | 226. |
| Trustee for Employees of Barker, California (Employee Trust) | 1300.97 |
| | 1526.97 |
| Total | 17894.35 |

We graphically illustrate the various stock changes which are hereinafter detailed:

On December 20, 1923, an agreement was entered into between the Lawrence Barker Interests and the C. H. Barker group, meaning C. H. Barker, C. A. Barker, and Erle P. Barker, for the purpose of readjusting the corporate and business affairs of the enterprise, and the stock interests of the parties; and an agreement was made by the Lawrence Barker Interests and the C. H. Barker group with Marshall Field, Glore, Ward & Co., investment bankers hereinafter called "Bankers", as a part of the readjustment plan.

Prime objects of the plan as expressed and agreed to in writing were to enable the Lawrence Barker Interests to change their voting stock interest in Barker Bros. (Barker California) to a non-voting stock or investment interest, and to thus afford the C. H. Barker-Employee Trust groups the exclusive control of the enterprise. Accordingly, the plan agreed upon provided for the formation of a new corporation, hereinafter called "Barker Delaware" in which the C. H. Barker group and the Employee Trust were to receive all the common voting stock and in which the Lawrence Barker Interests and the J. W. Beam individual interest were to receive preferred nonvoting stock which they were free to sell on the market. To this effect, a contract was made between the C. H. Barker group and the Lawrence Barker Interests on the one hand and the Bankers on the other whereby the Bankers agreed to buy 4130 shares of the Barker Delaware first preferred stock from Barker Delaware and 10,870 shares of Barker Delaware first preferred stock from the Lawrence Barker Interests; and the Lawrence Barker Interests agreed to give (and they subsequently did give) Bankers an option to purchase the remaining 10,000 shares of Barker Delaware first preferred stock. The Lawrence Barker Interests and J. W. Beam would thus end up with cash and Barker Delaware second preferred stock which they could dispose of as they wished.

In furtherance of the plan a California corporation called Lawrence Barker, Inc., hereinafter referred to as the "Securities Company", was created as of December 22, 1923, with an authorized capital stock of 20,000 shares of common stock with a par value of $100.00 per share. The purpose of the Securities Company was to receive the shares inuring to the Lawrence Barker Interests, pursuant to the plan.

On December 28, 1923, a Delaware corporation named Barker Bros., Inc., i. e. Barker Delaware, was created. The purpose of this corporation was to take over the affairs of Barker California, the original company. Barker Delaware's authorized capital stock consisted of:

25,000 shares, first preferred, $100. par per share;

25,000 shares, second preferred, $100. par per share;

100,000 shares, common, $100. par per share.

Accordingly, on December 28, 1923, the owners of the common stock of Barker California exchanged their stock for Barker Delaware common stock in the following several interests:

| Share Owner | Number of Shares |
| --- | --- |
| C. H. Barker Group | 43,946.09 |
| Employee Interests | 6,945.91 |
| Lawrence Barker Interests (issued in the name of the Securities Company) | 43,870. |
| J. W. Beam and Martha Beam | 935. |

Also, on December 28, 1923, 19,997 shares of the stock in the Securities Company were distributed proportionately among the Lawrence Barker Interests.[1]

The Securities Company exchanged its 43,870 shares of common stock of Barker Delaware for 20,870 shares of first preferred stock of Barker Delaware, and 23,000 shares of second preferred stock of Barker Delaware on December 29, 1923. J. W. Beam and Martha Beam received 935 shares of second preferred in exchange for 935 shares of common stock. On January 3, 1924, Barker Delaware amended its Articles of Incorporation to change its author-

1. The Lawrence Barker Interests received all of the Securities Company's author-

ized stock except for three organizational shares.

ized common stock from 100,000 shares at $100 par to 100,000 shares at no par. And on January 5, 1924, the C. H. Barker group, and J. W. Beam as Trustee for the Employees exchanged their 50,892 shares of Barker Delaware par common for 100,000 shares of Barker Delaware no par common. Thus the C. H. Barker group together with the Employee Trust group ended up with exclusive voting control of Barker Delaware.

In February, 1924, Barker Delaware sold to Bankers all its remaining unissued first preferred stock, 4130 shares. Pursuant to the terms of the agreement of December 20, 1923, the Securities Company sold to Bankers 10,870 shares of first preferred stock of Barker Delaware for $1,000,040 plus dividends accrued. From February 11, 1924, to May 16, 1924, Bankers exercised their option to acquire of the Securities Company its remaining 10,000 shares of Barker Delaware first preferred stock.

All of the assets of Barker California were transferred to Barker Delaware on March 1, 1924, subject to all of the outstanding liabilities of Barker California, including the liability for the outstanding preferred stock of Barker California which Barker Delaware thereupon redeemed.

## I.   The Action in the District Court

In December, 1943, the appellant-taxpayer sold thirty of the 19,997 shares of stock in Lawrence Barker, Inc., the Securities Company,[2] for $5,000 and included the entire amount as income from capital gain.

On March 15, 1947, the taxpayer filed a claim for refund of his 1943 income tax payments in the amount of $1,818.98 on the ground that the basis of the Securities Company stock was $219.35 per share, or $6,580.50 for thirty shares; and therefore, no gain, but rather a loss of $1,580.50 was realized on the sale of the shares for $5,000. The district court found that the 30 shares had a basis for determining gain or loss of $52.18 per share, and that accordingly the taxpayer was entitled to a refund in the amount of $434.61 since the gain realized was $3,434.60 on the sale of the thirty shares, rather than the full $5,000.

## II.   The Tax Basis for Gain or Loss

While it is the gain from the sale of the Securities Company stock in 1943 which the Commissioner is here taxing, the issue in dispute before us on appeal is confined to the determination of the basis for gain or loss which should be assigned to the Barker Delaware stock. For, both parties agree that the basis of the shares of the Securities Company stock is the same as the basis of the shares of the Barker Delaware stock for which they were exchanged.[3]

In order to ascertain the basis of the Barker Delaware stock, the Barker California-Barker Delaware transaction must be analyzed under the Revenue Act of 1932 to determine whether or not it was a "tax-free" exchange.[4] For, the Barker Delaware stock was acquired prior to 1934; and section 113(a)(12) of the Internal Revenue Code, 26 U.S.C.A. § 113(a)(12), requires

2.   The Securities Company stock, which taxpayer sold on December 28, 1943, was acquired by him as part of the 19,-997 shares of stock issued by the Securities Company to the Lawrence Barker Interests on December 28, 1923, in exchange for the transfer by the Lawrence Barker Interests to the Securities Company of the right to receive 43,870 shares of Barker Delaware stock which were exchanged for the Lawrence Barker Interests' 8179.69 shares of Barker California common stock.

3.   Although the end result was that the appellant-taxpayer received Securities Company stock in exchange for his Barker Delaware stock, several steps were employed. Appellant-taxpayer received

the Securities Company stock in exchange for his right to receive the Barker Delaware stock to which he was entitled by virtue of the transfer of his Barker California stock. (See Diagram, page 3.)

4.   26 U.S.C.A. § 113(a) (12): "If the property was acquired, after February 28, 1913, in any taxable year beginning prior to January 1, 1934, and the basis thereof, for the purposes of the Revenue Act of 1932, 47 Stat. 199, was prescribed by section 113(a) (6), (7), or (9) of such Act, then for the purposes of this chapter the basis shall be the same as the basis therein prescribed in the Revenue Act of 1932."

that property which was acquired prior to 1934, in a "tax-free" exchange where the basis was provided for in section 113(a)(6), (7), or (9) of the 1932 Revenue Act, must retain said basis.

Since the 1934 Revenue Act changed some of the definitions of tax-free exchanges, including the definition of a "tax-free reorganization", Congress enacted section 113(a)(12), supra, in the 1934 Act to continue the basis of property acquired prior to January 1, 1934, under a tax-free exchange as described in the Revenue Act of 1932. When Congress in 1936 made further changes in the exchange and basis provisions of the Revenue Act, it passed section 113(a)(16) to continue the basis for property acquired in the years when the 1934 Act applied. Both section 113(a)(12) and section 113(a)(16) were made part of the Revenue Code, Title 26. We therefore conclude that in enacting subsection (16), Congress did not repeal or replace subsection (12), but rather intended to continue it in effect as to those reorganizations and exchanges which had taken place prior to the 1934 Revenue Act. Section 113(a)(16) refers to the 1934 Act only in regard to the specific changes made by the 1936 Act. Since it was the 1934 Act, and not the 1936 Act which changed the definition of a "reorganization", and since the Barker California-Barker Delaware transaction took place prior to 1934, section 113(a)(12) governs in selecting the applicable definition of a "reorganization". See Montgomery's Federal Taxes, Vol. I, page 414; Revenue Act of 1934, Senate Reports, 73rd Congress, 1st and 2nd Sessions, Vol. 1, Report No. 558, page 35.

Section 113(a)(6) of the Revenue Act of 1932 declares that if property was acquired in an exchange described by section 112(b) to (e), its basis shall be the same as in the case of the property exchanged, with adjustment up or down depending on whether or not a gain or loss was recognized under the law applicable to the year in which the exchange was made:[5] Thus, if any subdivision of section 112(b) to (e) describes the Barker California-Barker Delaware transaction, said exchange must be classed as "tax-free."

Provisions for so-called "tax-free" exchanges which are found in section 112(b) to (e) of the Revenue Act of 1932 have been part of the tax structure since 1919.[6] The provisions were not enacted to give taxpayers exemptions from tax liability, but were enacted to postpone the recognition of taxable income where a taxpayer did not get something new in an exchange, but merely changed the form in which he held the identical property which he had held before the exchange. Portland Oil Co. v. C. I. R., 1 Cir., 1940, 109 F.2d 479. See also Randolph E. Paul, Studies in Federal Taxation, Third Series, "Reorganizations."

Furthermore, since it was the intention of Congress not to forgive, but only to defer taxes in the situation where a taxpayer has not received something new in an exchange, Congress also provided that when there has been a "tax-free" exchange the taxpayer must retain as the tax basis of the property received, the basis of the property which was given in exchange. Section 113(a)(6), Revenue Act of 1932, 26 U.S.C.A. § 113 (a)(6).

Therefore, if the Barker California-Barker Delaware transaction was "tax-free" under the provisions of section 112(b) to (e) of the Revenue Act of 1932, then the Barker Delaware stock must be measured by the basis of the Barker California stock, which was its cost, plus any gain or minus

5. Section 113(a) (6), Revenue Act of 1932: "If the property was acquired upon an exchange described in section 112(b) to (e), inclusive, the basis shall be the same as in the case of the property exchanged, decreased in the amount of any money received by the taxpayer and increased in the amount of gain or decreased in the amount of loss to the taxpayer that was recognized upon such exchange under the law applicable to the year in which the exchange was made. * * *"

6. Section 202, Revenue Acts of 1919 and 1921, 40 Stat. 1060 and 42 Stat. 229; Section 203, Revenue Acts of 1924 and 1926, 43 Stat. 256 and 44 Stat. 12; Section 112, Revenue Act of 1928, 45 Stat. 816; 26 U.S.C.A. § 112.

any loss, recognized in 1923, when the exchange took place.[7] But if no subdivision of section 112(b) to (e) is applicable, then the Barker California-Barker Delaware exchange was not "tax-free" and the basis of the Barker Delaware stock must be stepped up to its cost in 1923, i. e., the market value of the Barker California stock at the time of the exchange.

### III. Tax-Free Exchanges under Section 112(b)(5)

Appellant contends that section 112(b)(5) of the Revenue Act of 1932 [8] is the only subdivision of section 112 that is in point; but that it does not govern the fact situation in this case. Appellant's position is based on the fact that of the 95,697 shares which Barker Delaware issued, the Bankers had a right to 20,870 shares, or over 20 per centum of the total issue, immediately after the exchange. And therefore, the transferors of Barker California did not end up in control of Barker Delaware as defined by section 112(j) of the Revenue Act of 1932. 26 U.S.C.A.Int.Rev.Acts, page 514.[9]

Immediately after the first step in the exchange had been completed, the C. H. Barker group, J. W. Beam, and the Lawrence Barker Interests, who had together owned all of the Barker California common voting stock, owned all of the issued common voting stock of Barker Delaware. However, the Lawrence Barker Interests who held their Barker Delaware stock in the form of stock of the Securities Company, immediately in accordance with the plan exchanged their 43,870 shares of Barker Delaware common voting stock for an equal amount in number and par value of Barker Delaware first and second preferred non-voting stock. Of the 43,870 preferred shares thus acquired, the Bankers had a contract right to purchase 10,870 of the first preferred shares, and an option to purchase the remaining 10,000 first preferred shares.[10] While legal title to the optioned shares remained in the Securities Company until the option was exercised, as part of the transaction in which those shares had been acquired, the Lawrence Barker Interests had relinquished the right to dispose of the shares as they wished. Such a restriction upon their freedom of action deprived the Lawrence Barker Interests of unrestricted control of the stock. Bassick v. C. I. R., 2 Cir., 1936, 85 F.2d 8; National Rubber Machinery Co. v. United States, 38 F.Supp. 260, 268, 93 Ct.Cl. 340; but cf. Wilgard Realty Co. v. C. I. R., 2 Cir., 1942, 127 F.2d 514. Therefore, 23,870 shares which comprise over 20 per centum of either the 48,935 outstanding preferred shares or of the 95,697 total outstanding shares of Barker Delaware, were in the control of persons other than the transferors of Barker California stock as defined by section 112(j) of the Revenue Act of 1932; and accordingly, the provisions of section 112(b)(5) could not operate to make this a tax-free exchange.

### IV. Tax-Free Reorganization under Section 112(b)(3)

However, since it is only necessary for the transaction to fall within one of the subdivisions of section 112(b) to (e) in order to be classified as tax-free and thus postpone any recognition of gain or loss for tax basis purposes, Helvering v. Cement Investors, 1942, 316 U.S. 527, 62 S.Ct. 1125, 86 L.Ed. 1649, it is also necessary to consider the applicability of section 112(b)(3) of the Revenue Act of 1932 which states that:

"No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursu-

---

7. The Revenue Act of 1921 was in effect in 1923.

8. Section 112(b)(5) states that:
"No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such * * * persons are in control of the corporation; * * *."

9. Section 112(j), Revenue Act 1932:
"As used in this section the term 'control' means the ownership of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation."

10. The 23,000 shares of Barker Delaware second preferred were later sold by the Securities Company.

ance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization."

The policy behind allowing the postponement of taxes in certain types of reorganizations was to enable shareholders to reorganize a corporation without being forced to lose control of it where their new and old interests were substantially identical, and where an immediate recognition of gain might compel the original shareholders to dispose of part of their stock in order to meet the tax burden.

The plan which was agreed upon and carried out in the instant case contemplated one group's ending up with the control of the new corporation and the other group's getting an investment interest represented by preferred stock, at least part of which was under a sales-option contract to a third group. In such circumstances the parties to the transaction actually received substantially different property in exchange for their original holdings. It would thus seem that this was not an exchange to which the tax-free reorganization provisions were meant to apply; and therefore, a gain or loss should have been recognized at the time of the exchange.

However, prior to the changes in the definition of the term "reorganization" in the Revenue Code in 1934, it was possible for taxpayers to postpone the recognition of gain or loss for tax purposes by entering into a reorganization whereby one corporation acquired a majority of the voting stock of another corporation. Section 112(i)(1)(A) of the Revenue Act of 1932.[11] In this way the policy motivations behind "tax-free" reorganizations were to a large extent frustrated since taxpayers could, by observing the letter if not the intent of the statute, acquire substantially new interests and at the same time reap the benefit of postponing part of their tax liability until a more favorable year.

In 1934 and subsequent years Congress plugged the loophole offered by the definition of "reorganization" which had appeared in the parenthetical clause in section 112(i)(1)(A), supra, (see footnote [11]), by redefining the term as follows:

"(1) The term 'reorganization' means * * * (B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation, or (C) the acquisition by one corporation, in exchange solely for all or a part of its voting stock, of substantially all the properties of another corporation * * *." Section 112(g), Internal Revenue Code. [Emphasis ours.]

By raising from a majority, or 51 per centum, to 80 per centum the amount of voting stock which the acquiring corporation must receive in another corporation, and by requiring that the exchange be of voting stock for voting stock in order for the transaction to constitute "tax-free" reorganization, Congress has more accurately defined the circumstances in which a taxpayer at the end of a transaction has not received something new.

While the Revenue Act of 1934 narrowed the definition of a reorganization for tax purposes, it also required that the provisions of the 1932 Act continue to define "tax-free" transactions for the determination of the basis of property acquired prior to 1934. 26 U.S.C.A. § 113(a)(12). Therefore, since the Barker California-Barker Delaware transaction took place in 1923, the 1932 Act determines whether or not the transaction was "tax-free".

The definition of what transactions constitute a reorganization for tax purposes under the Revenue Act of 1932 is set out in

---

11. Section 112(i)(1)(A), Revenue Act of 1932: "As used in this section and sections 113 and 115—

"(1) The term 'reorganization' means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation), or * * *."

section 112(i)(1)(A) of that Act in part as follows:

"The term 'reorganization' means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation), or * * *."

We are of the opinion that the parenthetical clause in subsection (A), which applies only to transfers which took place before 1934, describes the Barker California-Barker Delaware transaction.

At the end of the first step in the Barker California-Barker Delaware transaction, Barker Delaware had acquired all of the voting common stock of Barker California, and 17,894.35, or over a majority of the 23,644.35 total voting shares in Barker California if the 5,750 shares of Barker California voting preferred stock are included.

However, subsection (A) further requires that in addition to the voting stock, the acquiring corporation must also receive a majority of "all other classes" of stock in the acquired corporation. Thus it might be argued that this transfer did not meet the statutory requirements for a "tax-free" reorganization since Barker Delaware did not acquire any of the voting preferred stock at the end of the first step. But each step in an entire transaction cannot be treated separately for income tax purposes. Halliburton v. C. I. R., 9 Cir., 1935, 78 F.2d 265. Where, as here, the parties to a transaction formulated a plan which contemplated several steps to accomplish the end result, and bound themselves by contract to carry out the plan, the actions taken constitute a single transaction As part of the entire transaction between Barker California and Barker Delaware, Barker Delaware eventually acquired all the voting preferred stock (which it immediately redeemed), as well as all of the properties of Barker California, which in itself would be enough to meet the requirements of section 112(i)(1)(A). Furthermore,

under the provisions of the 1932 Act, it was not necessary that the acquiring corporation transfer *solely* voting stock. Cf. section 112(g), Revenue Act of 1934. And so, the transfer does not lose its tax-free aspects by virtue of the fact that at the conclusion of the entire transaction Barker Delaware had transferred 43,870 non-voting preferred shares to the Barker California shareholders. Therefore, we conclude that the Barker California-Barker Delaware transaction was a reorganization under the Revenue Act of 1932.

It should also be noted that in a reorganization as defined by the parenthetical clause of section 112(i)(1)(A) the acquiring corporation must receive "at least a majority of the *voting* stock and at least a majority of the total number of shares of *all other classes* of stock of another corporation". [Emphasis ours.] We are of the opinion that the distinction here sought to be made is between all classes of voting stock on the one hand, and the various possible classes of non-voting stock on the other hand. But since all the Barker California stock was of the voting variety, and since Barker Delaware had acquired 17,-894.35 or considerably more than a majority of the total of 23,644.35 Barker California voting shares, even at the end of the first step in the entire transaction, the Barker California-Barker Delaware transaction was a reorganization as defined by the Revenue Act of 1932.

The Barker California-Barker Delaware transaction in addition to meeting the statutory definition of a reorganization, also meets the further requirement of section 112(b)(3) that there be an exchange of stock for stock in another corporation "a party to the reorganization". For the exchange was of stock for stock, and section 112(i)(2) defines "a party to a reorganization" as including "both corporations" in the case of an acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation.

We therefore conclude that the Barker California-Barker Delaware trans-

action was a "tax-free" reorganization under section 112(b) (3) of the Revenue Act of 1932, and so the basis of the Barker Delaware stock is the same as the basis of the Barker California stock plus any gain or minus any loss recognized under the Revenue Act of 1921 which was in effect in 1923 when the exchange took place.

Section 202(c) (2) of the Revenue Act of 1921, 42 Stat. 229, provided for the nonrecognition of gain or loss for tax and basis purposes:

"* * * [w]hen in the reorganization of one or more corporations a person receives in place of any stock or securities owned by him, stock or securities in a corporation a party to or resulting from such reorganization."

This language of the 1921 Act is identical in scope to the language of section 112(b) (3) of the 1932 Act. And the definition of what constitutes reorganization in section 202(c) (2) of the 1921 Act is identical to that under section 112(i) (1) (A) of the 1932 Act which was discussed above. Therefore, no gain or loss was recognized in 1923, and so the basis of the Barker Delaware stock is the same as the basis of the Barker California stock, i. e., its cost, $52.18 per share.

Affirmed.